# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | |
| **V.** | § § | **NO. 3:23-cr-2367-KC-1** |
| **EDUARDO QUINTANA-SOTELO** | § § § | |

## DEFENDANT'S MOTION TO DISMISS

MAUREEN SCOTT FRANCO
Federal Public Defender


_____/s/_____
JOSE F. MONCAYO
Assistant Federal Public Defender
Western District of Texas
700 E. San Antonio Ave., D-401
El Paso, Texas 79901
(915) 534-6525

*Attorney for Defendant*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 2

III.  LEGAL STANDARD........................................................................................... 3

IV.   SECOND AMENDMENT ARGUMENT ............................................................ 3

   A.   *Bruen* "fundamentally changed" the framework for analyzing Second Amendment challenges.................................................................................................. 3

   B.   Section 922(g)(1) facially violates the Second Amendment. ............................ 5

      1.   *The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1).* ........ 6

      2.   *The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."* ......................................................... 10

   C.   Section 922(g)(1) violates the Second Amendment as applied to Mr. Quintana.............. 24

V.    COMMERCE CLAUSE ARGUMENT ............................................................. 27

VI.   CONCLUSION.................................................................................................... 32

## I.    INTRODUCTION

Defendant Eduardo Quintana-Sotelo ("Mr. Quintana") moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), to dismiss Count Two of the Indictment, which charges possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). The law violates the Second Amendment on its face and as applied to Mr. Quintana.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed that the Second Amendment right to bear arms is not a second-class right. 142 S. Ct. 2111, 2156 (2022). The Court rejected decades of "judicial deference to legislative interest balancing" in the form of means-end scrutiny in Second Amendment jurisprudence. *Id.* at 2131. Instead, *Bruen* instructs courts to ask only: (1) whether the Second Amendment's plain text covers the conduct, and (2) whether the Government can show the law is consistent with historical firearm regulations. *Id.* at 2126. As the Fifth Circuit recently explained, *Bruen* "fundamentally changed" Second Amendment analysis and rendered prior precedent obsolete. *See United States v. Rahimi*, 61 F.4th 443, 450-51 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023). Under this new framework, the Fifth Circuit has struck down both of the federal criminal laws that have come before it since *Bruen*, §§ 922(g)(8) and (g)(3). *See id.* (holding § 922(g)(8) is unconstitutional); *United States v. Daniels*, 77 F.4th 337, 355 (5th Cir. Aug. 9, 2023) (holding § 922(g)(3) is unconstitutional as applied to Daniels).

For many of the same reasons, § 922(g)(1) violates the Second Amendment. Multiple courts have already found the law is unconstitutional, at least as applied to certain felons. *See Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc); *see also United States v. Leblanc*, __ F. Supp. 3d __, No. 23-cr-045, 2023 WL 8756694 (M.D. La. Dec. 19, 2023); *United States v. Griffin*, No. 21-cr-693, 2023 WL 8281564 (N.D. Ill. Nov. 20, 2023); *United States v. Quailes*, __ F. Supp. 3d __, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023); *United States v. Harper*, No. 1:21-cr-236,

2023 WL 5672311 (M.D. Pa. Sept. 1, 2023); *United States v. Forbis*, __ F. Supp. 3d __, No. 4:23-cr-133, 2023 WL 5971142 (N.D. Okla. Aug. 17, 2023); *United States v. Bullock*, __ F. Supp. 3d __, No. 3:18-cr-165, 2023 WL 4232309 (S.D. Miss. June 28, 2023). Indeed, one court has recently found that § 922(g)(1) *facially* violates the Second Amendment. *See United States v. Prince*, No. 1:22-cr-240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023). And this Court has already found two other federal categorical firearm prohibitions violative of the Second Amendment. *See United States v. Sing-Ledezma*, __ F. Supp. 3d __, No. 3:23-cr-823-KC-01, 2023 WL 8587869 (W.D. Tex. Dec. 11, 2023) (finding § 922(g)(5)'s prohibition on firearm possession by unlawfully present aliens violates the Second Amendment); *United States v. Connelly*, __ F. Supp. 3d __, No. 3:22-cr-229-KC-02, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023) (finding § 922(g)(3)'s prohibition on firearm possession by unlawful drug users violates the Second Amendment).

Section 922(g)(1) impacts the core Second Amendment right to possess a firearm for self-defense. This right belongs to all "the people" under the Constitution, including felons. And the Government cannot meet its burden to show § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation, because there is no relevant historical evidence of categorically disarming felons. At the very least, there is no evidence of disarming felons like Mr. Quintana, rendering the statute unconstitutional as applied to him.

Additionally, Mr. Quintana preserves for further review the question of whether § 922(g)(1) violates the Commerce Clause.

## II.    BACKGROUND

On November 21, 2023, the grand jury returned an indictment, charging Mr. Quintana with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), as well as several other firearms and drug charges. *See* Doc. No. 12. Upon information and belief, Mr.

Quintana's prior predicate felony for his § 922(g)(1) charge is possession of marijuana with intent to distribute.

## III.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the court to rule on a motion involving factual issues provided the court states its essential findings on the record); *see also*, *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *See Flores*, 404 F.3d at 325.

## IV.    SECOND AMENDMENT ARGUMENT

Section 922(g)(1) criminalizes firearm possession for any person who has been convicted of a crime punishable for a term exceeding one year. Under the new framework announced in *Bruen*, § 922(g)(1) violates the Second Amendment both facially and as applied to Mr. Quintana.

### A.  ***Bruen* "fundamentally changed" the framework for analyzing Second Amendment challenges.**

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified an individual right to possess and carry weapons, the

3

core purpose of which is self-defense in the home. 554 U.S. 570, 628 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right").

After *Heller*, this Court "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). In the first step, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (cleaned up). This involved determining "whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* at 754. If the conduct was outside the scope of the Second Amendment, then the law was constitutional. *Id.* Otherwise, courts proceeded to the second step to determine whether to apply strict or intermediate scrutiny. *Id*. The Fifth Circuit recognizes that the Supreme Court abrogated that framework in *Bruen*. *See Bruen*, 142 S. Ct. at 2127; *Daniels*, 77 F.4th at 341; *Rahimi*, 61 F.4th at 450.

In *Bruen*, the Supreme Court announced a new framework for analyzing Second Amendment claims. The Court rejected the second step of the inquiry adopted by circuit courts because "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* The Court reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. It elaborated that, under the new framework, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The Government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. If the Government cannot make that showing, then the regulation is unconstitutional. *Id*.

The Fifth Circuit has since explained that *Bruen* "fundamentally changed" Second Amendment challenges and rendered prior precedent in the area "obsolete." *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). Under *Bruen* and *Rahimi*, courts must apply the textual and historical framework to all Second Amendment challenges and cannot obviate that requirement by relying on pre-*Bruen* caselaw.

## B.  <u>Section 922(g)(1) facially violates the Second Amendment.</u>

Section 922(g)(1) violates the Second Amendment on its face under the *Bruen* framework. The *Bruen* Court drew no distinction between as-applied and facial challenges under the Second Amendment; in fact, neither term appears anywhere in the majority opinion. But *Bruen* itself established the standard for facial challenges: "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *Rahimi*, 61 F.4th at 453. Facial challenges consider only whether the text of the challenged statute is inconsistent with the Second Amendment's text and historical understanding. *Id.*; *see also Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019) ("A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." (cleaned up)). Section 922(g)(1) is facially unconstitutional because its text is inconsistent with the Second Amendment's text and historical understanding.

Courts generally consider the constitutionality of a statute as-applied before determining its facial constitutionality, to avoid striking down the statute in its entirety. *See Hollis v. Lynch*, 121 F. Supp. 3d 617, 629-30 (N.D. Tex. 2015) (citing *United States v. Vuitch*, 402 U.S. 62, 70 (1971), *Renne v. Geary*, 501 U.S. 312, 324 (1991)). For the purposes of analytical clarity, however, Mr. Quintana addresses his facial challenge first in this brief.

**1.  The Second Amendment's plain text covers the conduct prohibited by § 922(g)(1).**

Section 922(g)(1) permanently disqualifies all felons from exercising the fundamental right to possess firearms for self-defense. Under the plain text of the Second Amendment, it is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2129–30.

    a.  <u>Firearm possession is covered by the Second Amendment's plain text</u>.

The Second Amendment protects "the right of the people to keep and bear Arms …." U.S. Const. amend. II. The plain text, "keep and bear arms," means possessing and carrying weapons. *Heller*, 554 U.S. at 583–92. The Court in *Bruen* clarified that the core right to possess and carry a firearm for self-defense, identified in *Heller* and *McDonald*, extends outside the home. 142 S. Ct. at 2122. Section 922(g)(1) is a complete ban on all firearm possession, with no limitations on type or use. It, therefore, impacts the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also generally Bruen*, 142 S. Ct. 2111.[1]

The sole question at this stage of the *Bruen* analysis is whether "conduct" is covered by the plain text of the Second Amendment. *Id*. at 2126; *United States v. Bullock*, __ F. Supp. 3d __, No. 3:18-cr-165, 2023 WL 4232309, at *20 (S.D. Miss. June 28, 2023) ("*Bruen* step one requires us to look at the 'conduct' being regulated, not the status of the person performing the conduct."). Because firearm possession is conduct covered by the Second Amendment, it is presumptively protected.

    b.  <u>Felons are included in "the people" protected by the Second Amendment.</u>

The Second Amendment covers all citizens by conferring the right "to keep and bear arms" on "the people." U.S. Const. amend. II. The plain text does not limit who is included in "the

---

[1] Legislative history suggests that Congress, in passing the modern version of § 922(g)(1), acknowledged that it would infringe an individual's right to bear arms, but wrongly concluded that the Second Amendment does not confer an individual right to bear arms. *See, e.g.*, S. Rep. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2169; *see also Heller*, 554 U.S. at 628.

people." *Id*. The text simply says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has confirmed that "the Second Amendment right is exercised individually and belongs to *all* Americans." *Daniels*, 77 F.4th at 342 (quoting *Heller*, 554 U.S. at 581). So whether a category of person can be disarmed is a question of historical tradition—and falls under the second *Bruen* step, not the Second Amendment's plain text.

*Heller* rejected the theory that "the people" protected by the Second Amendment were limited to a subset—i.e., those in a militia. 554 U.S. at 579–81, 592–600. The Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 580–81. *Heller* explained that, like the First, Fourth, and Ninth Amendments, the Second Amendment codified an individual right. *Id.* at 579–80. Categorically excluding felons from the plain text of the Second Amendment would, therefore, endanger felons' basic protections under the First and Fourth Amendment. *See Range v. Att'y Gen.*, 69 F.4th 96, 101-02 (3d Cir. 2023). Otherwise, it would run afoul of *Bruen*'s directive that the Second Amendment is "not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (cleaned up); *cf. United States v. Coombes*, 629 F. Supp. 3d 1149, 1155-56 (N.D. Okla. 2022) (declining to exclude felons from the scope of the Second Amendment).

One sitting Justice—who joined the majority in *Bruen*—has explained that this language from *Heller* means that a person's status is properly considered in the question of historical tradition, rather than the purely textual question of the existence of the right. In *Kanter v. Barr*, then-Judge Barrett reasoned that, under *Heller*, the word "people" refers to "all Americans"—that

even those who can be lawfully restricted, are not "categorically excluded from our national community." 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111. The "question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.*; *cf. United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045–46 (11th Cir. 2022) (interpreting *Heller* to say that felons and others who could be disarmed are still part of "the people" protected by the Constitution). Thus, a person's status as a felon is properly considered in the historical tradition inquiry and does not affect whether the person has a Second Amendment right. *Kanter*, 919 F.3d at 451–52.

The Fifth Circuit has now twice rejected the Government's attempts to limit "the people" protected by the Second Amendment to only "law-abiding, responsible citizens." *See Rahimi*, 61 F.4th at 451–53; *Daniels*, 77 F.4th at 342. The court reiterated *Heller*'s conclusion that the right "belongs to all Americans." *See Daniels*, 77 F.4th at 342. And both *Daniels* and *Rahimi* endorsed Justice Barrett's reasoning that any "law-abiding" qualifier would relate to the power to restrict a right, not the scope of the right itself. *Rahimi*, 61 F.4th at 451–52 (explaining the Government's argument is wrong and runs "headlong into *Heller* and *Bruen*, which we read to espouse" the Justice Barrett approach from *Kanter*); *Daniels*, 77 F.4th at 343 n.2 (noting its reasoning accords with *Range* and the *Kanter* dissent). As *Rahimi* explained, the Government's imposition of this gloss onto the scope of the right "turns the typical way of conceptualizing constitutional rights on its head," because a person could be "readily divested" of the right—"in one day and out the next." 61 F.4th at 452–53 (citing *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting)). It further noted that the "Government's proffered interpretation of 'law-abiding' admits to no true limiting principle." *Id*. at 453. Rather, "as a general rule, limitations on the Second Amendment come from the

traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorially excluded from the privilege." *Daniels*, 77 F.4th at 343 (citing *Rahimi*, 61 F.4th at 453); *see also Bullock*, 2023 WL 4232309, at *20-21 (finding felons are not excluded from the Second Amendment at step one).[2]

    The Third Circuit has specifically held that felons are protected by the Second Amendment, repudiating in even clearer terms the Government's attempt to limit the right to "law-abiding, responsible" citizens." *See Range*, 69 F.4th at 101-03.[3] Indeed, no circuit court has held that felons are excluded from the Second Amendment's protections on *Bruen*'s first step. *See United States v. Jackson*, 69 F.4th 495, 501-06 (8th Cir. 2023) (addressing only *Bruen*'s second step); *United v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023) ("We assume, without deciding, that step one of the *Bruen* test is met.").

---

[2] The Fifth Circuit acknowledged the Supreme Court's use of the term "law-abiding, responsible citizens," but explained "we cannot read too much into the Supreme Court's chosen epithet." *Daniels*, 77 F.4th at 342. The court noted the language meant to "exclude from the discussion the mentally ill and felons, people who were historically stripped of their Second Amendment rights." *Id.* at 343 (citing *Rahimi*, 61 F.4th at 452). But any such "exclusion" would be as part of *Bruen*'s second step, which examines the historical power to restrict firearms. *See id.* ("as a general rule, limitations on the Second Amendment come from the traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorically excluded from the privilege"); *see also United States v. Sitladeen*, 64 F.4th 978, 986 (8th Cir. 2023) (reading *Rahimi* to require consideration of a person's status at the historical, second step of *Bruen*); *United States v. Melendrez-Machado*, __ F. Supp. 3d __, No. 3:22-cr-634-FM, 2023 WL 4003508, at *3–4 (W.D. Tex. June 14, 2023) (same); *United States v. McDaniel*, No. 22-cr-176, ECF No. 53 at 7 (E.D. Wis. May 3, 2023) ("In other words, the 'law-abiding' language was shorthand for the historical analysis, not a (significant) limitation on who initially falls within the amendment's scope."). Indeed, the *Daniels* court discusses the historical "stripping" of rights, not the absence of rights. 77 F.4th at 343. Both longstanding prohibitions and groups historically stripped of their rights involve a *historical* analysis. Any alternative reading would directly contradict *Rahimi* and *Daniels*'s reiteration of *Heller*, endorsement of Justice Barrett's approach, and rejection of the "law-abiding" gloss proffered by the Government. *See id.* at 342-43; *Rahimi*, 61 F.4th at 451–53.

[3] Since *Bruen*, several district courts have likewise recognized that a person's status is not properly considered at this stage of the *Bruen* framework. *See, e.g., Bullock*, 2023 WL 4232309, at *20; *United States v. Quiroz*, 629 F. Supp. 3d 511, 516-17 (W.D. Tex. 2022) (finding § 922(n) unconstitutional); *United States v. Coombes*, 629 F. Supp. 3d 1149, 1155-56 (N.D. Okla. 2022) (upholding § 922(g)(1), but finding the conduct was presumptively protected by the Second Amendment).

Because the Second Amendment right belongs to "all Americans," *Heller*, 554 U.S. at 580–81, the categorical ban on an individual's possession of a firearm based on their status as a felon is presumptively unconstitutional under the plain text of the Second Amendment. Whether a category of person can be disarmed is a question of historical tradition, which is the Government's burden under *Bruen*.

**2.  The Government cannot show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation."**

Because the plain text of the Second Amendment covers § 922(g)(1), the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Government cannot meet that burden.

The *Bruen* framework requires the Government to establish that the challenged law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. *Bruen* set out some metrics by which the sufficiency of the historical precedent should be analyzed: (1) the historical regulations' temporal proximity to the founding era, (2) the breadth of historical regulations, and (3) the similarity of the historical regulation to the challenged restriction. *Bruen*, 142 S. Ct. at 2130–34, 2136, 2138.

For temporal proximity, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the

intervening years." *Id.*[4] Similarly, the Court explained that "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* The Court expressed skepticism about reliance on laws passed long after the passage of the particular Constitutional Amendment and explained that, "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

Regarding breadth, the Government must show "a tradition of broadly prohibiting" conduct in the manner of the challenged restriction. *Id.* at 2138. In other words, the founding-era historical evidence must show a "governmental practice" that has been "open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2137 (cleaned up). The Government cannot "simply posit that the regulation promotes an important interest." *Id.* at 2126. Nor can it rely on "outlier" historical restrictions. *Id.* at 2133, 2156. Indeed, the *Bruen* Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition[.]" *Id.* at 2142 (emphasis in original). Moreover, it is incumbent on the Government, not the Court, to provide the record of this broad historical tradition. *See id.* at 2130 n.6, 2150.

Lastly, the Government must present founding-era historical examples comparable to the challenged regulation. *Bruen* described two approaches for how similar historical evidence must be to a challenged regulation. *See Daniels*, 77 F.4th at 342. For a regulation that "addresses a general societal problem that has persisted since the 18th century," a "straightforward historical inquiry" applies. *Bruen*, 142 S. Ct. at 2131. For that straightforward inquiry, the "lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the

---

[4] The Fourteenth Amendment was implicated in *Bruen* because the Fourteenth Amendment imposes the Second Amendment's pronouncement on a state regulation or law. But Reconstruction-era laws are of limited value when addressing a *federal* law, which implicates the Second Amendment, not the Fourteenth. *See Daniels*, 77 F.4th at 347-48; *see also Bruen*, 142 S. Ct. at 2137–38; *see also id.* at 2163 (Barrett, J., concurring).

challenged regulation is inconsistent with the Second Amendment." *Id*. A distinctly similar regulation, as illustrated by *Bruen*'s historical analysis, means that the historical regulation must be meaningfully the same.[5] *Id*. at 2153. In contrast, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]" *Id*. Whether a historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id*. at 2132–33. But this "nuanced approach" only applies to "modern regulations that were unimaginable at the founding." *Id*. at 2132. The Fifth Circuit recently explained that the two tests seemed "aimed at interpreting historical silence." *Daniels*, 77 F.4th at 344. If the Founders encountered the same problem sought to be addressed by a modern regulation, the lack of a distinctly similar law signals disapproval. *Id*. But if the problem did not exist at that time, the Founders' silence says little about their approval of such a regulation. *Id*.

a. <u>The Government cannot produce "distinctly similar" laws that prove a tradition of categorically disarming felons.</u>

The Government cannot meet its burden under *Bruen* because there is no historical tradition, particularly from the founding era, of disarming all felons—i.e., "distinctly similar" regulations. Section 922(g)(1) does not address an "unprecedented societal concern" nor is it a "modern regulation that [was] unimaginable at the founding." *See Bruen*, 142 S. Ct. at 2132. Felons have existed since long before the founding. Therefore, like in *Bruen* and *Heller*, the court should

---

[5] The Court found only one statute sufficiently analogous to the New York public-carry restriction to be "distinctly similar"—a Texas statute effectively identical to the New York restriction. *Bruen*, 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws § 1). The Texas statute forbade carrying a pistol unless the person had reasonable grounds to fear an attack, and the New York regulation required the person to show a special need for defense before issuing a public-carry license.

apply the "straightforward approach," and the Government bears the burden to show founding-era laws that are "distinctly similar" to § 922(g)(1), not just "relevantly similar."

### The history of categorical firearms restrictions
### does not support disarming felons.

Reviewing historical examples of categorical restrictions on firearm possession—i.e., wholesale disarmament of a particular category of person—sets the proper backdrop for the *Bruen* analysis. While there is some limited historical evidence of disarming certain specific categories of people, much was expressly rejected by the Second Amendment, and none supports finding § 922(g)(1) constitutional.

Historical analyses of firearms rights and regulations generally begin with pre-founding English common law, though the Supreme Court cautions against placing undue emphasis on English laws, particularly laws that long pre-date this Nation's founding. *See Bruen*, 142 S. Ct. at 2138–39. As early as the 15th and 16th century, English law targeted potentially disloyal communities, including Catholics and the Welsh, for disarmament. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 257–65 (2020) [Greenlee]. In the Restoration period of the mid-17th century, the Stuart monarchs more aggressively disarmed political and religious dissidents. *See Heller*, 554 U.S. at 592–93. For example, the Militia Act of 1662 permitted disarming those adjudged to be "dangerous to the Peace of the Kingdom"; the 1671 Game Act, involved disarmament of those who did not own property, particularly in Protestant regions; and forfeiture of "armour" could be ordered for those who went "armed to terrify the King's subjects." *Id.*; *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting). Laws like the Militia Act of 1662 were generally understood as pretextual and overreaching statutes used to disarm political opponents, and were expressly rejected in the United States by the Second Amendment. *See Rahimi*, 61 F.4th at 456; *see also* Diarmuid F.

13

O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 401–02 (2019).

Indeed, the Declaration of Rights—a precursor to the Second Amendment—explicitly rejected abuses like the Militia Act and ensured that Protestants would not be disarmed. *See Heller*, 554 U.S. at 593; Edward Lee, *Guns and Speech Technologies: How the Right to Bear Arms Affects Copyright Regulations of Speech Technologies*, 17 Wm. & Mary Bill Rts. J. 1037, 1058 (2009); Joyce Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 114–18 (1994) [Malcolm]. Following the Glorious Revolution in 1688, a Convention of elected representatives drafted the Declaration of Rights, which included that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *See Heller*, 554 U.S. at 593; Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021) [Ristroph]. Almost immediately thereafter, Parliament began disarming Catholics viewed as potential dissidents. *See id*. Through the 18th century, England targeted "papists and other disaffected persons, who disown his Majesty's government," for disarmament, to quell concerns over potential rebellions and insurrections. *See* Greenlee at 260–61. The most discernable English tradition prior to American independence was the disarmament of religious dissidents perceived as threatening to the crown. *See id*. at 257–61.

In the American colonies during the 17th and 18th centuries, categorical disarmament was largely reserved for Native Americans, indentured servants, enslaved persons, black freedmen, and others outside of the "body politic." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 156–58 (2007) [Churchill]. Scholars have likewise recognized a trend of disarming individuals who voluntarily excluded themselves from that "body politic" by refusing to swear allegiance, first to the crown,

and later to the American Revolution and newly established states and commonwealths. *Id*. at 157–61. As in England, the colonial period also included examples of disarming individuals based on their religion, where religious expression was deemed seditious or incompatible with loyalty to the sovereign. *See* Greenlee at 263.

The Second Amendment was ratified in 1791. The codification of the right repudiated the attempted disarmament of disloyal colonists, much like its English precursor was a rejection of the disarmament of dissidents in Restoration-era England. *See Heller*, 554 U.S. at 592–95, 598. Commentary immediately following ratification illustrates the view that certain restrictions from the English Restoration were inconsistent with the right that was ultimately codified in the Second Amendment. *See id*. at 606–08. And while the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions included proposals to limit the right to "peaceable citizens," or to expressly permit disarmament for those in "rebellion" or for "crimes committed," this language was not included in the Second Amendment itself. *See Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting).

Historical evidence from the period immediately surrounding ratification is entitled to significant weight under *Bruen*. While some categorical firearms restrictions persisted during this time, scholars have noted the period was marked by less burdensome temporary restrictions and the ability to have firearms rights restored. Greenlee at 268–70. For example, some religious dissidents in the Bay Colony had their rights restored after expressing contrition, and even those who engaged in an armed rebellion in Massachusetts were only subjected to a three-year prohibition on bearing arms. *Id*.

By the 19th century, "prohibitions on arms possession were mostly discriminatory bans on slaves and freedmen," or on targeted disfavored groups like "tramps." *Id*. at 269–70. But these prohibitions, like earlier laws, did not disarm felons as a class. After a full survey of printed session

15

laws on gun regulation, history professor Robert H. Churchill concluded: "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." Churchill at 142, 143 n.11.

It was not until the 20th century that legislatures began to pass modern, categorical firearms bans, including the first to include felons. Greenlee at 272–75. Congress passed the first version of the modern federal firearm ban for violent felons in 1938, expanding it to include non-violent felons in 1961 and all possession in 1968.[6] State laws disarming felons were, likewise, first adopted in the early 20th century. *See* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) [Winkler] ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) [Lund] (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar).

A brief review of English and early American historical categorical firearms restrictions evidences a troubling tradition of disarming religious and political dissidents and targeted minority communities, but not felons. The Second Amendment is properly understood as a repudiation of many of these oppressive regulations, rather than an endorsement of such categorical restrictions. But, insofar as the United States incorporated any tradition of categorical exclusion, it assuredly did not include the targeted disarmament of felons until the 20th century.

---

[6] *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

***The absence of "distinctly similar" founding-era regulations disarming
felons renders § 922(g)(1) unconstitutional.***

Turning to the *Bruen* framework, the absence of "distinctly similar" founding-era laws renders 922(g)(1) unconstitutional. *See Bruen*, 142 S. Ct. at 2133. There are no founding era laws "distinctly similar" to § 922(g)(1). *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (noting scholars have not been able to identify any founding-era laws disarming all felons); *see also* Winkler at 1563. The Government has historically conceded this fact. *See Bullock*, 2023 WL 4232309, at *28-29 (noting that historically the "U.S. Department of Justice formally advanced the position that early American history did *not* support felon disarmament"). The earliest firearm restrictions for felons in America were passed in the 20th century. *See, e.g.*, Greenlee at 272–75. The modern statutes that dispossessed felons of firearms, including § 922(g)(1), bear "little resemblance to laws in effect at the time the Second Amendment was ratified[.]" *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also NRA*, 700 F.3d at 196. Reliance on the passage of § 922 itself to support its own historical tradition is logically circular and ignores *Bruen*'s skepticism of 20th century historical evidence. *See Bruen*, 142 S. Ct. at 2137, 2154 n.28.

Before *Bruen*, courts often acknowledged the absence of founding-era felony restrictions. Yet they concluded that § 922(g)(1) was constitutional by relying on *Heller*'s dicta that prohibitions on felon firearm possession were "longstanding," or by applying the now-abrogated means-end scrutiny test. *See Booker*, 644 F.3d at 24 (citing *Heller*, 554 U.S. 626–27, 627 n.16 (noting that the opinion does not cast doubt on longstanding prohibitions on firearm possession by certain individuals, including felons, which are presumptively lawful)); *Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019) (same); *see also United States v. Williams*, 616 F.3d 685, 691–94 (7th Cir. 2010) (holding § 922(g)(1) survives Second Amendment challenge under intermediate scrutiny).

17

This reasoning is irreconcilable with the framework laid out in *Bruen*. The Supreme Court expressly rejected the use of means-end scrutiny. *Bruen*, 142 S. Ct. at 2127–30. Moreover, the "longstanding prohibitions" language in *Heller* is dicta, and courts and scholars have cautioned against reliance on it. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).[7] Indeed, in referring to "longstanding prohibitions," the *Heller* Court never suggested that these prohibitions would be exempt from historical scrutiny. To the contrary, *Heller* explained "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. *Bruen* acknowledged the same. *See* 142 S. Ct. at 2128 (noting its prior caution that it was not undertaking an "exhaustive historical analysis … of the full scope of the Second Amendment"). Since *Bruen*, the en banc Third Circuit has rejected reliance on this "longstanding prohibition" language to uphold § 922(g)(1), noting that the statute, passed in the 20th century, "falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right." *Range*, 69 F.4th at 104.

*Bruen* requires the Government to provide "distinctly similar" historical examples from the founding era to prove consistency with the Nation's traditions. *See generally Bruen*, 142 S. Ct. 2111. It did not create an exception to its framework for firearm restrictions for felons.[8] Courts are simply not permitted to disregard the framework laid out in *Bruen*, based on dicta from *Heller*. If categorical prohibitions for felons are indeed "longstanding," and satisfy the newly articulated

---

[7] *See also* Winkler at 1567; Nicholas J. Johnson, et al, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 855 (3d ed. 2022); Lund at 1356-57.

[8] *Bruen*'s majority opinion is silent about this issue. Justice Kavanaugh, in a concurring opinion joined by Chief Justice Roberts, cited the "longstanding prohibitions" language from *Heller*. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring). Justice Alito also noted in a concurrence that the opinion did not disrupt the holdings of *Heller*. *Id.* at 2157 (Alito, J., concurring). But neither concurrence announced that § 922(g)(1) is constitutional or subject to a relaxed Second Amendment analytical framework.

framework in *Bruen*, the Government would be able to identify specific "distinctly similar" historical examples of such a tradition. But it cannot.

The absence of founding-era laws specifically disarming felons forecloses the Government's ability to show "distinctly similar historical regulation[s]" like § 922(g)(1) and is relevant evidence of the statute's unconstitutionality.

### Felons were, in fact, likely <u>required</u> to keep firearms at the founding, further undermining any historical basis for § 922(g)(1).

Not only were felons *permitted* to keep firearms at the founding; they were almost certainly *required* to keep them.

The lack of historical firearm restrictions on felons is not surprising. At the founding, the *right* to bear arms was also deeply connected to the historical *duty* to bear arms. *See* Malcolm at 138–40; Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 219–22 (3d ed. 2022) [Johnson]. Indeed, the Second Amendment codified an individual right, but the prefatory clause clarifies that the purpose of that right was to "prevent elimination of the militia." *Heller*, 554 U.S. at 599. This duty to bear arms was reflected in federal and state laws *requiring* most citizens to keep firearms as part of militia service. *See, e.g.*, Second Militia Act, § 1, 1 Stat. 271 (May 8, 1792).[9] These laws "exempted" certain classes of people, but

---

[9] Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty five years … shall severally and respectively be enrolled in the militia." Second Militia Act, § 1. The Act further required that "every citizen so enrolled … shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and other related items like ammunition. *Id.* Similar contemporaneous state militia statutes also did not to exempt felons or those under indictment. *See, e.g.*, Thomas Herty, DIGEST OF THE LAWS OF MARYLAND 367–73 (1799); Act of Dec. 28, 1792, ch. 33, 6 N.H. Laws 84–92 (1917); Act of Apr. 4, 1786, 1 N.Y. Laws 227–36 (T. Greenleaf 1792); Act of Mar. 20, 1780, ch. 902, 5 Pa. Stat. 144–73 (J. Mitchell & H. Flanders comm'rs 1904); Horatio Marbury & William H. Crawford, DIGEST OF THE LAWS OF THE STATE OF GEORGIA 350 (1802); *cf. United States v. Miller*, 307 U.S. 174, 178–82 (1939) (discussing militia laws); Johnson 177–89 (in depth discussion about arms requirements for militia service in each colony).

not felons. *Id.* § 2, 1 Stat. 272; *cf.* Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 278 (2021) [Barondes] (finding no evidence that those with criminal convictions were excluded from militia duties or firearm ownership). The colonies generally required even indentured servants—often convicted criminals—to be armed for militia service. *See* Johnson 185, 191–92. Countless colonial laws similarly required citizens to keep and carry firearms to and from church, as part of patrol duties, to aid against attacks by Native Americans, or otherwise to defend themselves and their community. *See id.* at 189–91; Stephen P. Halbrook, THE RIGHT TO BEAR ARMS 131–35, 191–98 (2021).

It follows that, while "the Second Amendment is not limited to only those in the militia, it must protect at least the pool of individuals from whom the militia would be drawn." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 750 (N.D. Tex. 2022). Disarming indictees would have made little sense to the Founders, because it would have effectively relieved them of a civic duty. Despite passing myriad other gun restrictions—early versions of gun registrations, safe storage laws, restrictions on types of firearms, and disarmament of Native Americans, enslaved persons, and religious minorities—the founders never proposed barring felons from receiving guns or disarming them. *See* Adam Winkler, GUNFIGHT 113–18, 286–87 (2013) (detailing Revolutionary era gun laws and noting absence of restrictions like those from the 20th century).

    b.  <u>The Government cannot meet the lower standard to show "relevantly similar"</u>
        <u>laws that support a tradition of categorically disarming felons.</u>

The Government cannot even meet the less burdensome standard to show "relevantly similar" firearms restrictions to § 922(g)(1) from the founding era. Courts that have upheld § 922(g)(1) since *Bruen* have largely eschewed the requirement to show specific similar historical

regulations. Instead, many have relied on general arguments by the Government that § 922(g)(1) is consistent with traditions of disarming other "unvirtuous" or "dangerous" groups of citizens. The position is ahistorical and inconsistent with *Bruen, Rahimi*, and *Daniels*.

Even prior to *Bruen*, some courts relied on a purported tradition of disarming "dangerous" or "unvirtuous" citizens to support modern felon disarmament laws. *See Medina*, 913 F.3d at 159 (collecting cases). This "virtuous citizen" theory, however, lacks historical support. *See* Greenlee at 275–83. The earliest articles promoting the theory fail to cite to any historical evidence. *See id.*; *see also* Barondes; *Folajtar v. Att'y Gen. United States of America*, 980 F.3d 897, 915–16 (3d Cir. 2020) (Bibas, J., dissenting) (referring to the academic sources for the "virtuous citizen theory" as "like the layers of a matryoshka doll, each nested layer successively larger with little at the core. Once we take them apart, none proves that felons' lack of virtue excludes them from the Second Amendment.").

Rather, as described above, historical categorical disarmament was generally limited to disempowered minority communities—e.g., enslaved persons, freed black Americans, and Native Americans—and those who evidenced disloyalty to the government. *See* Greenlee at 261–65; Churchill at 156–61. Many of these types of categorical restrictions were rejected by the Second Amendment and courts have cautioned against citing to such "historical travesties to support taking someone's Second Amendment rights today." *See United States v. Hicks*, 649 F. Supp. 3d 357, 364 (W.D. Tex. 2023).[10] But even those of arguable historical relevance do not "impose a comparable burden on the right" and are not "comparably justified" to § 922(g)(1)'s categorical

---

[10] It is unsurprising that communities of color, which have historically been subjected to reprehensible Second Amendment and other constitutional deprivations, are disproportionately impacted by statutes like § 922(g)(1). *See generally* Barondes.

disarmament of felons. *See Bruen*, 142 S. Ct. at 2133 (explaining metrics of comparing "relevantly similar" analogues).

Indeed, insofar as there is any historical basis for disarming "unvirtuous" or "dangerous" citizens, the Fifth Circuit has rejected reliance on much of it under *Bruen*. *See Rahimi*, 61 F.4th at 456-59; *Daniels*, 77 F.4th at 350–55. The Fifth Circuit found that many historical examples proffered by the Government were not only insufficiently analogous to § 922(g)(8) and § 922(g)(3), but historically dubious more broadly speaking. Most importantly, the court rejected efforts to compare felon disarmament to a generalized tradition of disarming the "dangerous," explaining that to "remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of 'dangerousness'" *Id*. at 354; *cf. Bruen*, 142 S. Ct. 2143, 2150, 2156 (criticizing defining the category "far too broadly"); *Medina*, 913 F.3d at 159–60 (rejecting the similar "dangerousness standard" as too "amorphous … to delineate the scope of the Second Amendment").

The Fifth Circuit has also rejected reliance on much of the particular underlying historical evidence. *Rahimi* dismissed politically motivated English disarmament laws as inconsistent with the Second Amendment. 61 F.4th at 456. It questioned reliance on laws disarming enslaved persons, Native Americans, and disloyal people, which "may well have been targeted at groups excluded from the political community—i.e., written out of 'the people' altogether[.]" *Id*. at 457. It foreclosed reliance on alternative proposals during ratifications conventions to impose dangerous persons limitations on the Second Amendment, because they were not included in the Second Amendment's text. *Id*. And it reasoned that laws related to "going armed offensively" curbed terroristic conduct, not individuals, and that it is "doubtful these 'going armed' laws are reflective of our Nation's historical tradition of firearm regulation, at least as to forfeiture of

firearms." *Id.* at 457-59. *Daniels*, similarly, explained that laws disarming certain "dangerous" groups are not similar to § 922(g)(3), because they sought to quell possible threats to the government by rebellion, not generalized public harm. 77 F.4th at 343–55. For all these reasons, reliance on such dubious historical support for § 922(g)(1) likewise fails.

The Third Circuit has likewise rejected reliance on much of this type of historical evidence, at least as applied to certain offenders charged under § 922(g)(1). *Range*, 69 F.4th at 104-07. With respect to certain historical laws disarming so-called "dangerous" people, the court explained that the Government had failed to successfully analogize them to the appellant, and that lumping such groups together was "far too broad" an analogy. *Id.* at 105. *Range*, like *Daniels*, confirms that the Government cannot simply group together disparate laws and characterize them as a broad tradition; *Bruen* requires comparison of a challenged law to actual historical laws. While the court limited its holding to Range's as applied challenge, the reasoning would extend to § 922(g)(1) more broadly. Indeed, several of the dissenting opinions acknowledged the same. *See id.* at 116 (Shwartz, J., dissenting) ("the ruling is not cabined in any way and, in fact, rejects all historical support for disarming any felon"), at 131 (Krause, J., dissenting) ("the majority imposes a constitutional framework so standardless as to thwart the lawful application of 18 U.S.C § 922(g)(1) to *any* offender"). At least one court in this Circuit has followed *Range*'s lead and struck down § 922(g)(1) as applied, rejecting this type of historical evidence. *See Bullock*, 2023 WL 4232309, at *21-26, 29-31.

The frequently cited history of disarming "dangerous," "irresponsible," or "unvirtuous" people lacks historical support and is insufficient to demonstrate a historical tradition of regulations "relevantly similar" to § 922(g)(1), as required by *Bruen*.

\* \* \*

23

The Government cannot show historical evidence distinctly or relevantly similar to § 922(g) that would illustrate a tradition of categorically disarming felons. It, therefore, cannot overcome the presumption that § 922(g)(1) violates the Second Amendment. *See Bruen*, 142 S. Ct. at 2126. The statute is facially unconstitutional.

### C. Section 922(g)(1) violates the Second Amendment as applied to Mr. Quintana.

Even if the Court determines that § 922(g)(1) is not facially unconstitutional, the statute violates the Second Amendment as applied to Mr. Quintana, whose predicate felony is a single non-violent marijuana charge. "As-applied challenges are the basic building blocks of constitutional adjudication[.]" *Gonzalez v. Carhart*, 550 U.S. 124, 168 (2007). "Unlike a facial challenge, an as-applied challenge does not contend that a law is unconstitutional as written, but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Binderup v. Att'y Gen.*, 836 F.3d 336, 345 (3d Cir. 2016) (citation omitted); *see also generally Daniels*, 77 F.4th 337 (conducting as-applied *Bruen* analysis of § 922(g)(3)).

As discussed above, Mr. Quintana's conduct—i.e., possession of a firearm and ammunition in common use for self-defense—is clearly protected by the plain text of the Second Amendment. *See Bruen*, 142 S. Ct. at 2129-30. The burden is, thus, on the Government to show that disarming those with criminal records like his is consistent with the Nation's historical traditions. *See id*. at 2130. There is no such tradition of barring felons from firearm possession, let alone felons with records like Mr. Quintana.

The Third Circuit recently explained that, under the *Bruen* framework, § 922(g)(1) violates the Second Amendment at least as applied to certain offenders. *See Range*, 69 F.4th 96. Range was barred from possessing a firearm because of his conviction for welfare fraud. *Id.* at 98. The district court dismissed his challenge and was affirmed by a Third Circuit panel. *Id.* at 99. But, after rehearing en banc, the Third Circuit reversed. *Id.* Even prior to *Bruen*, the Third Circuit had

determined that § 922(g)(1) was unconstitutional as applied to those convicted of certain less serious offenses—corrupting a minor and carrying a handgun without a license. *See Binderup*, 836 F.3d 336 (citation omitted). *Range* acknowledged that *Bruen* had overturned the multifactored "seriousness" inquiry undertaken in *Binderup*, in favor of the simpler burden on the Government to show historical evidence for the challenged. *See Range*, 69 F.4th at 100-01.

*Range* rejected every historical analogue proffered by the Government in favor of disarming certain felons. *See id*. at 103-06. Notably, it rejected reliance on pre-*Bruen* caselaw and references to so-called "longstanding prohibitions," that were not supported by historical evidence. *Id*. at 103-04, 106. It also dismissed laws disarming groups of purportedly dangerous or unvirtuous people, as "far too broad" an analogy under *Bruen*. *Id*. at 104-05. And it dismissed reliance on the historical use of capital punishment for felons, explaining that the power to execute certain people does not imply the power to disarm. *Id*. at 105-06. It specifically declined to decide whether there was a historical tradition of disarming even dangerous or violent felons, or otherwise distinguishing whether other felons might be permissibly disarmed. *See id*. at 104 n.9. As it explained, the Government had simply failed to meet its burden to show a historical tradition of disarming those like Range. *See id*. Though, as discussed elsewhere, other judges acknowledged that the court's reasoning would seem to apply more broadly to other felons, because the Government relied on the same historical evidence in such cases. *See id.* at 113 (Shwartz, J., dissenting), at 118, 131 (Krause, J., dissenting). Since *Range*, district courts in this Circuit have found that § 922(g)(1) violates the Second Amendment even as applied to a man convicted of aggravated assault and manslaughter, *see Bullock*, 2023 WL 4232309, and a man convicted of armed robbery, *see United States v. Leblanc*, __ F. Supp. 3d __, No. 23-cr-045, 2023 WL 8756694 (M.D. La. Dec. 19, 2023).

For many of the reasons articulated in *Range* and *Bullock*, the Government cannot show a historical tradition of disarming people like Mr. Quintana. *Range* and *Bullock* appear to acknowledge an absence of historical evidence to support disarming felons at all. But even looking to the limited holding of *Range*, and certain pre-*Bruen* precedent, courts have acknowledged that there is at least no history to support disarming those convicted of less serious or non-violent crimes. *See Binderup*, 836 F.3d 336; *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (noting insofar as there was any power to disarm, it extended only to those proven to be dangerous). And the *Bullock* court found that the Government had failed to even show a historical tradition of disarming "either the violent or the dangerous." 2023 WL 4232309, at *31.

It is the Government's burden to show a historical tradition that supports disarming people like Mr. Quintana. That is, even if the Court were to accept that historical evidence supports disarming *some* felons, for Mr. Quintana's *as applied* challenge, the Government must show it supports disarming Mr. Quintana. *See generally Range*, 69 F.4th 96; *Daniels*, 77 F.4th 337 *see also Kanter*, 919 F.3d at 467 (Barrett, J., dissenting) (explaining that non-violent felons could bring as applied challenges to § 922(g)(1)). Mr. Quintana's predicate felony conviction does not suggest that he is particularly "dangerous," or otherwise subject to firearm restrictions like those targeted at the founding. Indeed, there is little evidence that *any* categories of people were *permanently* disarmed at the founding, let alone those like Mr. Quintana. Rather, he has one conviction for possessing marijuana with intent to distribute. There is no historical evidence to support disarming felons at all, but certainly not those with criminal records like Mr. Quintana. *See United States v. Griffin*, No. 21-cr-693, 2023 WL 8281564 (N.D. Ill. Nov. 20, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant with prior marijuana conviction and other more serious criminal history); *United States v. Quailes*, __ F. Supp. 3d __, No. 1:21-cr-176, 2023 WL 5401733

(M.D. Pa. Aug. 22, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant with drug trafficking conviction). Any suggestion that marijuana offenses render people so dangerous as to merit the deprivation of constitutional rights is belied by the Department of Justice's own practices, as well as a near consensus of policy makers.[11] He is at least the type of offender recognized in *Range*, *Bullock*, or in the *Kanter* dissent, for whom there is no historical evidence of disarmament.

Because the Government cannot show that restricting firearms for those with criminal histories like Mr. Quintana's is consistent with the Nation's historical traditions, § 922(g)(1) violates the Second Amendment as applied to Mr. Quintana. *See Bruen*, 142 S. Ct. at 2126.

## V.    COMMERCE CLAUSE ARGUMENT

Mr. Quintana also argues that § 922(g)(1) violates the Commerce Clause.

The U.S. Constitution created a federal government of enumerated powers. *See* U.S. Const. art. I, § 8. In *United States v. Lopez*, the Supreme Court invalidated the Gun-Free School Zones Act, holding that it exceeded Congress's authority under the Commerce Clause of the U.S. Constitution. 514 U.S. 549 (1995). Congress has the power "[t]o regulate commerce with foreign nations, and among the several states." U.S. Const. art. I, § 8, cl. 3. The Court identified three categories of activities that Congress may regulate under its commerce power: "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate

---

[11] *See, e.g.,* Press Release, UNITED STATES DEPARTMENT OF JUSTICE, *Justice Department Statement on Presidents Announcements Regarding Simple Possession of Marijuana* (Oct. 6, 2022), available at: https://www.justice.gov/opa/pr/justice-department-statement-president-s-announcements-regarding-simple-possession-marijuana; *Statement from President Biden on Marijuana Reform*, (Oct. 6, 2022), available at: https://www.whitehouse.gov/briefing-room/statements-releases/2022/10/06/statement-from-president-biden-on-marijuana-reform/; United States Sentencing Commission, *Quick Facts: Marijuana Trafficking Offenses* (June 2020), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Marijuana_FY19.pdf (last visited Jan. 8, 2024); National Conference of State Legislatures, *Marijuana Deep Dive*, https://www.ncsl.org/bookstore/state-legislatures-magazine/marijuana-deep-dive.aspx (last visited Sept. 1, 2022).

commerce … Finally, Congress's commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *Lopez*, 514 U.S. at 558–59 (internal citations omitted). The Court concluded that § 922(q) did not fall within the first two categories. Thus, if it survived constitutional scrutiny, "it must be under the third category as a regulation of activity that substantially affects interstate commerce." *Lopez*, 514 U.S. at 559.

The *Lopez* Court held that, under the third category, "[t]he proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559. Section 922(q) failed the "substantial effect" test because Lopez's gun possession had nothing to do with commerce and was not a part of a greater scheme of commercial regulation. *Lopez*, 514 U.S. at 561–63; *see also United States v. Morrison*, 529 U.S. 598 (2000) (holding federal statute governing gender-motivated violence unconstitutional under Commerce Clause).

*Lopez* reflected the previous caution by the Supreme Court that the scope of the commerce power "must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). In other words, the Commerce Clause does not create a federal police power.

The *Lopez* rationale—that possession of a weapon on school premises did not substantially affect interstate commerce to the extent necessary to allow the exercise of the federal commerce power—also applies to the federal statute prohibiting felons from possessing firearms, 18 U.S.C. § 922(g)(1). To be constitutional, § 922(g)(1) must regulate activity that substantially affects interstate commerce. To meet this requirement, the statute must either involve commercial activity

28

or include an interstate-commerce element that is sufficient to provide case-by-case proof of a substantial relation to commerce. Because § 922(g)(1) does not meet these requirements, it is unconstitutional.

Section 922(g)(1) makes it "unlawful for any person … who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year … to … possess in or affecting commerce[ ] any firearm or ammunition[.]" Before *Lopez*, the Supreme Court analyzed a similarly worded predecessor statute, 18 U.S.C. § 1202(a), in *United States v. Bass*, 404 U.S. 336 (1971). The Court held that, under the statute's text, the government was required to demonstrate some nexus between interstate commerce and the felon's possession of the weapon. 404 U.S. at 350. A few years later, in *Scarborough v. United States*, the Court held, as a matter of statutory interpretation, that "Congress intended no more than a minimal nexus requirement." 431 U.S. 563, 577 (1977). The *Scarborough* Court did not address the constitutionality of the minimal nexus requirement. *See id.* Rather, the Court held that proof that the possessed firearm previously traveled in interstate commerce is statutorily sufficient. *Id.* at 564, 578.

In *Lopez*, the Court suggested that the presence of a statutory nexus should be considered in determining whether a statute violates the Commerce Clause. *Lopez*, 514 U.S. at 561. Some courts have inferred from this suggestion that the mere presence of a jurisdictional element such as that in § 922(g)(1) will always save a statute from a Commerce Clause challenge. *See, e.g.*, *United States v. Santiago*, 238 F.3d 213, 216 (2d Cir. 2001); *United States v. Dorris*, 236 F.3d 582, 585 (10th Cir. 2000); *cf. United States v. Rawls*, 85 F.3d 240, 242 (5th Cir. 1996) (upholding § 922(g)(1), in part, on presence of jurisdictional element). The Supreme Court rejected this inference in *Jones v. United States*, 529 U.S. 848 (2000).

In *Jones*, the Court considered whether the federal arson statute, 18 U.S.C. § 844(i), which contains a jurisdictional element like that in § 922(g)(1), criminalizes the destruction of privately-owned property. 529 U.S. at 850. The Court construed the jurisdictional element in § 844(i) narrowly, to limit the statute's proscription to arson of property that is "currently used in commerce or in an activity affecting commerce." *Id.* at 859. In so ruling, the Court noted that a broader construction might render the statute unconstitutional under *Lopez*. *Id.* at 858.

Although *Jones*'s analysis turned on the definition of the word "use" in the arson statute—a term not present in the felon-in-possession statute—the case nonetheless has important implications for § 922(g)(1). Significantly, the Court in *Jones* indicated that the mere presence of a jurisdictional element will not save a statute from a Commerce Clause challenge. Instead, that element must be construed, if possible, to bring the statute within the limits set by the Constitution. *Id.* As the *Jones* Court recognized, those parameters were established in *Lopez*.

Thus, both *Lopez* and *Jones* cast substantial doubt on the constitutionality of the *Scarborough* statutory analysis, which requires no more than a showing of tangential connection to commerce. *See United States v. Bell*, 70 F.3d 495, 498 (7th Cir. 1995) (noting doubt). Acknowledging that previous cases were unclear on the point, the *Lopez* Court stated that the prohibited activity must substantially affect commerce "to be within Congress's power to regulate it under the Commerce Clause." *Lopez*, 514 U.S. at 559.

Criminalizing the possession of a firearm simply because that firearm at one time crossed state lines or entered commerce is an unconstitutional exercise of Congressional power. The interstate-commerce element does not save § 922(g)(1) because that element does not by itself satisfy the "substantial effect" test. Section § 922(g)(1) does not regulate the use of interstate commerce or its channels, or things in interstate commerce. Mere possession of a weapon has

nothing to do with business or commerce; thus, it does not fall within the category of activities justifiably regulated by the federal government under the Commerce Clause. The statute is, therefore, unconstitutional.

Mr. Quintana recognizes that the Fifth Circuit has rejected this argument facially. In *Rawls*, the Fifth Circuit held that "neither the holding in *Lopez* nor the reasons given therefor constitutionally invalidate § 922(g)(1)." 85 F.3d at 242. But the court commented that, "[i]f the matter were res nova, one might well wonder how it could rationally be concluded that mere possession of a firearm in any meaningful way concerns interstate commerce simply" because the firearm had at some previous time traveled in interstate commerce. *Id.* at 242-43 (5th Cir. 1996) (Garwood, J., joined by Wiender & Garza, JJ., specially concurring); *see also United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013).

The *Rawls* court also rejected a challenge as applied to circumstances less compelling than the ones presented by the Government's case here.[12] Relying on the statutory construction in *Scarborough* and *United States v. Fitzhugh*, 984 F.2d 143, 146 (5th Cir. 1993), the court held that the "'in or affecting commerce' element can be satisfied if the firearm possessed by a convicted felon had previously traveled in interstate commerce." 85 F.3d at 242. The court did not analyze whether the facts presented there would satisfy the *Lopez* commerce standard. The Fifth Circuit has since reflexively denied as-applied challenges,[13] but recently denied a petition for rehearing

---

[12] Rawls was convicted of both § 922(g)(1) and acquiring a firearm by knowingly making a false statement, 18 U.S.C. § 922(a)(6), *Rawls*, 85 F.3d at 241—an act that affects commerce more than mere possession.

[13] *See, e.g.*, *United States v. Kuban*, 94 F.3d 971, 973 & n.4 (5th Cir. 1996) (noting that "were the matter *res nova* a powerful argument could be made for a contrary result"); *United States v. Pierson*, 139 F.3d 501, 503 (5th Cir. 1998) (citing *Rawls*); *United States v. De Leon*, 170 F.3d 494, 499 (5th Cir. 1999) (same); *United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (per curiam) (same, rejecting as-applied challenge to found shotgun shells).

en banc by a narrow margin, indicating potential interest in reevaluating the issue. *See United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022).

Acknowledging that this Court is bound by *Rawls* and *Alcantar*, Mr. Quintana raises his argument that § 922(g)(1) is facially invalid because it exceeds Congress's power to preserve it for further review. To be constitutional, § 922(g)(1) must regulate activity that substantially affects interstate commerce. To meet this requirement, the statute must either involve commercial activity or include an interstate-commerce element that is sufficient to provide case-by-case proof of a substantial relation to commerce. Because § 922(g)(1) does not meet these requirements, it is unconstitutional.

Additionally, § 922(g)(1) is unconstitutional as applied to Mr. Quintana's conduct. The Government's anticipated evidence will not show that Mr. Quintana's alleged possession of the firearm had a substantial effect on commerce. Applying § 922(g)(1) to Mr. Quintana's local conduct simply because the gun was made out of state and at some point crossed into Texas violates the Commerce Clause. Alternatively, the statutory language "in or affecting commerce" should not be construed to reach Mr. Quintana's conduct. Because the evidence will not show conduct within the scope of the statute, or within Congress's power to prohibit, the Court should dismiss Count Two of the Indictment.

## VI.    CONCLUSION

WHEREFORE, for the foregoing reasons, Mr. Quintana requests that the Court dismiss Count Two of the Indictment.

Respectfully Submitted,


Maureen Scott Franco
Federal Public Defender

/S/
JOSE F. MONCAYO
Assistant Federal Public Defender
Western District of Texas
Richard C. White Federal Building
700 E. San Antonio, D-401
El Paso, Texas 79901
(915) 534-6525
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of January, 2024, I electronically filed the foregoing with the Clerk of Courts using the CM/ECF system which will send notification of such filing to the following: AUSAs Kyle Myers and Patricia Josefina Acosta, Office of the U.S. Attorney, Richard C. White Building, 700 E. San Antonio, Suite 200, El Paso, TX 79901.

/S/
JOSE F. MONCAYO
Assistant Federal Public Defender
Western District of Texas
Richard C. White Federal Building
700 E. San Antonio, D-401
El Paso, Texas 79901
(915) 534-6525
*Attorney for Defendant*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **V.** | § | **NO. 3:23-cr-2367-KC-1** |
| | § | |
| **EDUARDO QUINTANA-SOTELO** | § | |
| | § | |

## <u>ORDER</u>

On this day, the Court considered Defendant's Motion to Dismiss, and the Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby:

ORDERED that Count Two of the Indictment in this cause is DISMISSED.

SIGNED this ____ day of _____, 20__.


_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE